## NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BRIDGET J. LUDANYI,

                Plaintiff,

v.

NANCY A. BERRYHILL,

                Defendant.

Case No.:  2:17-cv-02558 (PAZ)

**OPINION**

**APPEARANCES:**

AGNES S. WLADYKA
AGNES S. WLADYKA, L.L.C.
1122 ROUTE 22 WEST
MOUNTAINSIDE, NJ  07092
      On behalf of Plaintiff

KIMBERLY ANN VARILLO
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 SPRING GARDEN STREET, SIXTH FLOOR
PHILADELPHIA, PA  19123
      On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Bridget J. Ludanyi for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.) and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. §§ 1381, et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the applications; Defendant, the Commissioner of Social Security ("the

Commissioner"), opposes Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

In May 2013, Plaintiff filed applications for DIB and SSI alleging a disability onset date of July 29, 2010.  (R. 192-99.)[2]  On August 14, 2013, the Commissioner determined that Plaintiff was not disabled and denied the applications.  (R. 84, 96.)  Plaintiff filed for reconsideration, and her applications were again denied on December 12, 2013.  (R. 108, 121.)  On September 10, 2015, an Administrative Law Judge held a hearing on Plaintiff's applications; Plaintiff was represented by counsel at the hearing.  (R. 34-77.)  On October 6, 2015, the ALJ issued a decision denying Plaintiff's applications.  (R. 17-33.)  On February 10, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-7), thereby affirming the ALJ's decision as the "final" decision of the Commissioner.  On April 13, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3).  ECF No. 1.  On June 14, 2018, Plaintiff consented to have

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  On March 6, 2018, the Government Accountability Office stated that, as of November 17, 2017, Ms. Berryhill's status violated the Federal Vacancies Reform Act, which limits the time a position can be filled by an acting official and "[t]herefore Ms. Berryhill was not authorized to continue serving using the title of Acting Commissioner[.]"  *Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1988 Commissioner*, Social Security Administration, Government Accountability Office (Mar. 6, 2018).  However, Ms. Berryhill continues to functionally lead the Social Security Administration from her position of record as Deputy Commissioner of Operations.  Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as the defendant in this suit.

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 7.

a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 18.[3]  The case was reassigned to the undersigned Magistrate Judge on June 27, 2018.

## II.    LEGAL STANDARD

### A.    <u>Standard of Review</u>

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for DIB and SSI.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see, e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Coleman*, 2016 WL 4212102 at *3 (citing *Schonewolf*, 972 F. Supp. at 284-85) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978))).

Although the ALJ is not required "to use language or adhere to a format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing

*Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4.  The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482.  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705.  As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings.  *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984)).  Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award

benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

### B.    <u>Standard for Awarding Benefits</u>

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for DIB or SSI based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. §§ 404.1505(a), 416.905(a).[4] An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion. *Id*. §§ 404.1521, 416.921.

---

[4] Although the standards for disability are the same for both DIB and SSI, these are separate government programs subject to different qualification requirements.

The process for determining an adult's claim for DIB or SSI involves a five-step sequential inquiry. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[5]  The claimant bears the burden of proof at Steps One through Four.  At Step Five, the burden shifts to the Commissioner.  *Id.* §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014).  At each Step, the ALJ must consider the combined effect of all of the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step.  20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit.  *Id.* §§ 404.1572(a) & (b), 416.972(a) & (b).  If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities.  An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

limitations. *Id.* §§ 404.1522, 416.922. If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment(s) in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926. If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence. *Id.* §§ 404.1526(b)(2), 416.926(b)(2). If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled as long as the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id.* §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work. 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date. In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity. *Id.* §§ 404.1560, 404.1565, 416.945, 416.960. If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id.* at §§ 404.1569a(a) & (b), 416.969a(b). Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *Id.* §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). The Grid Rules reflect various combinations of RFC, age, education, and work experience and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without

considering the additional non-exertional or exertional limitations. *Id.* §§ 404.1569a(d), 416.969a(d). If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id.* §§ 404.1569a(c), 416.969a(c).

## III. ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 43 years old on the alleged onset date of July 29, 2010, and her date last insured was December 31, 2012. (R. 22, 27.) At Step One of the decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date. (R. 121.) At Step Two, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia, anxiety, and vision disorders. (R. 22.) The ALJ also found at Step Two that Plaintiff had the following impairments that were not severe: allergy, asthma, high blood pressure, and diabetes mellitus. (R. 22-23.) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing. (R. 23-24.) At Step Four, the ALJ found that Plaintiff had the RFC to perform light work subject to various exertional and non-exertional limitations. (R. 24-27.) The ALJ also found at Step Four that Plaintiff was unable to perform her past relevant work as a medical assistant and specimen processor. (R. 27.) At Step Five, the ALJ alternatively found both that a finding of not disabled would be directed by Grid Rule 202.21 if Plaintiff had the RFC to perform the full range of light work. The ALJ also found at Step Five that at least 3 jobs – addresser, document preparer, and order clerk – existed in significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC. (R. 28.) The ALJ therefore concluded that Plaintiff was not disabled at any time between the alleged onset date and the decision date. (R. 28.)

As best the Court can discern from the briefs, Plaintiff contends that the ALJ committed reversible error:  (1) by failing "to make mention of [P]laintiff's obesity" (ECF No. 11 at 16); (2) by "merely making a conclusory statement that claimant's impairments do not meet and/or equal a Listing of Impairment" (ECF No. 11 at 10-13); (3) because the RFC finding "is merely conclusory and is not supported by the medical evidence" (*id*. at 20-23); (4) by failing "to give proper credence to" Plaintiff's subjective complaints (*id*. at 14-15, 17-19); and (5) by relying on the VE's testimony (*id*. at 24-25).[6]  *See* ECF No. 16 (reply submission repeating arguments almost verbatim).  Plaintiff asks the Court to reverse and remand for payment or, alternatively, for a new hearing.  Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

## IV.    SUMMARY OF RELEVANT EVIDENCE

### A.    <u>Medical Evidence Before The ALJ.</u>

#### 1.    Treating Physicians.

There is limited medical evidence in the record regarding Plaintiff's vision impairments. In March 2012, Plaintiff was evaluated by Dr. Chinwendu N. Anukwuem (optometrist) with Broadway Vision Services.  (R. 456.)  Plaintiff complained about blurry vision and ocular pain,

---

[6] Plaintiff additionally argues that the ALJ committed reversible error by failing to develop the record "in that he did not allow [P]laintiff's counsel to complete questioning of [P]laintiff at the hearing."  ECF No. 11 at 13-14.  There is nothing in the record to support this contention.  Although the ALJ attempted to keep the hearing moving, counsel for Plaintiff never complained about her ability to fully develop the record, nor did she ever ask to be allowed to further question her client.  In any event, the hearing lasted nearly 1 hour.  Approximately 9 pages of the transcript correspond to Plaintiff's questioning by the ALJ (R. 36-45); approximately 20 pages correspond to Plaintiff's questioning by her counsel (including follow-up questions by the ALJ (R. 45-67); and approximately 2 pages correspond to time spent resolving technical recording issues (R. 58-59, 63).  The Court reviewed the entire transcript and finds that Plaintiff was afforded a full and fair hearing.  *See Fraser v. Astrue*, 373 F. App'x. 222, 225 (3d Cir. 2010) (rejecting argument that ALJ was biased because "[e]ven assuming, however, that the ALJ was rather brusque, there is no indication that there was any conflict of interest or inability to render a fair judgment").

redness, itching, and excessive watering. Dr. Anukwuem found that Plaintiff's best corrected vision was 20/20 in both eyes and diagnosed: ocular allergy, disc cupping asymmetry consistent with a glaucoma suspect, hyperopia, astigmatism, and presbyopia. She prescribed artificial tears and allergy drops, and she instructed Plaintiff to return in 1 month for an optical coherence tomography (OCT) imaging test. In April 2012, Plaintiff returned to Dr. Anukwuem. (R. 455.) Plaintiff reported, and Dr. Anukwuem observed, that the ocular allergy condition had improved. Dr. Anukwuem found that Plaintiff had normal optical coherence tomography and visual field readings but should return in 6 months to monitor the glaucoma suspect. In November 2012, Plaintiff was evaluated by Dr. Simki Shah (optometry) with Eye Institute of Essex. (R. 317.) Dr. Shah found that Plaintiff's best corrected vision was 20/20-1 in her right eye and 20/25+2 in her left eye, and diagnosed a glaucoma suspect in both eyes. He instructed Plaintiff to return in 1 month for a follow up visual field, gonioscopy, and intraocular pressure check. In February 2013, Plaintiff returned to Dr. Shah. (R. 318.) He found that Plaintiff's best corrected vision was 20/20 in both eyes, diagnosed a glaucoma suspect (high risk), and instructed Plaintiff to return in 10 months for observation.

The record contains treatment notes from Dr. Edward Kalmer (internal medicine) with Internet Medical Group for the period from January 2010 to October 2012. (R. 289-316.)[7] In May 2010, Plaintiff saw Dr. Kalmer with complaints about pain "all over" and was diagnosed with hypertension and fibromyalgia. During an April 2011 follow-up, Plaintiff received the same diagnoses. During an August 2011 follow-up, Plaintiff complained about panic attacks; she received the same diagnoses. During an October 2011 follow-up, Plaintiff complained about pains

---

[7] Dr. Kalmer's treatment notes use pre-printed checkboxes for examination findings that include: memory; mood; paresthesias; claudication; joint pain; back ache; warm/hot joints; limited range of motion; motor; sensory; reflexes; and musculoskeletal.

from her fibromyalgia; she received the same diagnoses. During a December 2011 follow-up, Plaintiff stated that her fibromyalgia was doing better on Neurontonin; she received the same diagnoses. During follow-ups in January, February, and April 2012, Plaintiff had no specific complaints and received the same diagnoses. On April 13, 2012, Dr. Kalmer completed an Examination Report and advised that Plaintiff's diagnoses were hypertension and myalgia/myositis. He did not identify any psychiatric or psychological disability. Dr. Kalmer opined that she could work 2-4 hours a day; he noted that "patient gets tired." He did not indicate that Plaintiff needed an assistive device or that she had any specific exertional restrictions. During follow-ups in May (when Plaintiff complained about back pain, and examination findings included cervical spasms), June, August, and October 2012 (when Plaintiff had no specific complaints, and examination findings included joint pain and back ache), Dr. Kalmer's diagnoses were hypertension and fibromyalgia.

The record contains treatment notes from Dr. Thomas R. Ortiz (family medicine) and Cristina Tavarez (physician assistant) with Forest Hill Family Health Associates for the period from December 2012 to February 2015. Treatment notes for the entire period indicate that Plaintiff did not feel that she needed assistance with walking, bathing, grooming, dressing, or eating. From August 2013 to February 2015, the "Handicapped/Special Needs" section of the treatment notes indicate that Plaintiff used a cane for mobility when needed. Prior to August 2013, this section reads "no."

In December 2012, Plaintiff was evaluated to obtain medical clearance for a dental procedure. Examination findings were normal, including a notation that her "mental status [was within normal limits], alert and oriented x3, no findings of depression or anxiety, memory intact." She was diagnosed with hypertension and obesity. In January 2013, Plaintiff was treated for

cold/allergy and rash symptoms; she also complained about panic attacks.  Examination findings were normal except for a notation that Plaintiff reported feeling anxious and depressed.  She was diagnosed with a cough/allergic rhinitis, generalized anxiety, depression, and hypertension.  During a February 2013 follow-up, Plaintiff stated that her prescribed fibromyalgia medication was helping.  Examination findings were normal, including a notation that her "mental status [was within normal limits], alert and oriented x3, no findings of depression or anxiety, memory intact."  Plaintiff was diagnosed with myalgia and myositis (fibromyalgia).  During a July 2013 follow-up, Plaintiff complained that her entire body hurt, including her joints.  Examination findings included: that all joints were tender to the touch with greater than 18 tender trigger points; that Plaintiff felt depressed; and a notation that her "mental status [was within normal limits], alert and oriented x3, no findings of depression or anxiety, memory intact."  Plaintiff was diagnosed with unspecified joint pain, generalized anxiety, depression, myalgia and myositis (fibromyalgia), hypertension benign stable, and morbid obesity.  During an August 2013 appointment to review bloodwork results, Plaintiff was diagnosed with diabetes mellitus, myalgia and myositis (fibromyalgia), hypertension benign stable, and morbid obesity.  During a November 2013 follow-up, Plaintiff stated that her medications provided moderate relief from fibromyalgia pain but sometimes caused nausea.  Examination findings were normal, and her diagnoses were the same as in August 2013 but with the addition of depression.

During a February 2014 follow-up, Plaintiff stated that her prescribed pain medications were not helping much and that she had an upcoming initial appointment with a rheumatologist.  Examination findings were normal, and her diagnoses were the same as in November 2013.  In May 2014, Plaintiff was treated for cold/allergy symptoms.  Examination findings were normal, including a notation that she had full range of motion and no muscle spasms in her back.  She was

diagnosed with unspecified allergies and rhinitis.  During a September 2014 follow-up, Plaintiff stated that a neurologist had diagnosed bilateral carpel tunnel syndrome but had not given her wrist splints.  Plaintiff complained about occasional numbness in her fingers (mostly upon awakening). Examination findings were normal, including a notation that "mental status [within normal limits], alert and oriented x3, no findings of depression or anxiety, memory intact."  She was prescribed bilateral cock up wrist splints, and she was diagnosed with carpal tunnel syndrome, diabetes mellitus, myalgia and myositis (fibromyalgia), hypertension benign stable, and morbid obesity. During a February 2015 follow-up, Plaintiff complained about lower back pain and stated that she received moderate relief from prescribed pain medications.  Examination findings were normal, including a notation that bilateral knees exhibited crepitus but were non-tender and had full passive and active range of motion.  She was prescribed a lumbar brace and bilateral knee braces, and she was diagnosed with asthma, chronic depression, displaced lumbar disc (by history), neuropathy, osteoarthritis, carpal tunnel syndrome, diabetes mellitus without complication, fibromyalgia, and hypertension benign essential hypertension.

The record contains treatment notes from Dr. Robert Fogari (rheumatology) for the period from February 2014 to September 2015.  (R. 383-404, 457-72.)[8]  During an initial evaluation in February 2014, Dr. Fogari's impression was that Plaintiff presented with fibromyalgia, a Vitamin D deficiency, and diabetes mellitus.  A bone density scan report dated March 4, 2014 revealed adequate mineralization with no evidence of osteoporosis.  During a March 2014 follow-up, Dr. Fogari diagnosed degenerative disc disease, fibromyalgia, and obesity.  During a May 2014 follow-up, he diagnosed degenerative disc disease and fibromyalgia.  During a June 2014 follow-

---

[8] Dr. Fogari's handwritten treatment notes are mostly illegible prior to March 2015, when he switched to a typewritten system.

up, he diagnosed degenerative disc disease, fibromyalgia, and hypertension. An electromyography (EMG)/nerve conduction study (NCS) report dated July 15, 2014 revealed evidence of a mild left sensory median nerve neuropathy at the wrist that is consistent with clinical diagnosis of carpal tunnel syndrome, but no evidence of peripheral neuropathy. During follow-up visits in August, September, October, November, and December 2014, and in January 2015, Dr. Fogari diagnosed carpal tunnel syndrome, degenerative disc disease, fibromyalgia, and hypertension. During a March 2015 follow-up, Plaintiff complained about joint pain, muscle pain, and numbness. Dr. Fogari's examination findings included bilateral shoulder stiffness/tenderness and bilateral lumbar stiffness. His diagnoses were the same as the prior visit. During an April 2015 follow-up, Plaintiff again complained about joint and muscle pains. Dr. Fogari's examination findings included bilateral shoulder stiffness, cervical stiffness, bilateral wrist tenderness, and positive Tinel's sign bilaterally. His diagnoses were gastric reflux, carpal tunnel syndrome, fibromyalgia, and hypertension. During an August 2015 follow-up, Plaintiff complained of joint and back pains with stiffness. There are no examination findings or diagnoses in the corresponding treatment note. During a September 2015 follow-up, Plaintiff complained about joint pain and numbness in her extremities. Dr. Fogari's examination findings included bilateral shoulder tenderness, bilateral lumbar tenderness, and bilateral knee stiffness. He diagnosed depression, peripheral neuropathy, degenerative disc disease, and fibromyalgia.

### 2.    Non-Treating Physicians.

On July 9, 2013, Plaintiff was evaluated by Dr. Rambhai C. Patel (internal medicine). (R. 319-24.) Plaintiff informed Dr. Patel that her current medications included Flovent, Gabapentin, Losartan, Metoprolol, Ventolin, and depression pills. Plaintiff stated that she had hypertension since 2000 and that, 2-3 times per week, her elevated blood pressure causes her to experience spots

in her eye, headaches, and body swelling. She also stated that she had a history of asthma, with the latest attack occurring approximately a week ago. The attacks occurred 1-2 times per month, but do not require her to go to the emergency room. In between attacks, she experienced shortness of breath when walking 1-2 blocks or climbing 6 steps. Plaintiff further stated that she was diagnosed with fibromyalgia in 2008 and experienced pain all over the body, including eyes, joints, hands, knees, neck, and back. She told Dr. Patel that she had long suffered with depression that caused her to isolate herself in the house. Dr. Patel reported that Plaintiff's EKG and chest x-ray results were normal; her vision without glasses was 20/20 on the left side and 20/40 on the right side. He also reported that Plaintiff was "slightly obese, not in acute distress, walking without any walking device with a normal gait;" had normal reflexes and sensation, and no edema or tenderness, in bilateral lower extremities; had no neurological gross deficits; normal bilateral shoulders without localized tenderness or deformity; and had normal bilateral hand grip with no swelling of the interphalangeal joints. Dr. Patel diagnosed hypertension, history of chronic asthma, anxiety and depression syndrome, history of fibromyalgia causing pain all over the body, obesity, and refraction error. He concluded his report with a "comments" section noting Plaintiff's asthma condition and opining that "[s]he can do both fine and gross movements in both hands. The grip was normal. Gait, walking without any walking device." Dr. Patel also completed a Passive Range of Motion Chart in which he circled this pre-printed sentence: "Sections left blank will be considered normal." The form was left blank except for notations that Plaintiff was able to squat, walk on heels, walk on toes, had no sensory or reflex loss, could walk at a reasonable pace, and did not use a hand-held assistive device.

On July 17, 2013, Plaintiff was evaluated by Dr. Alexander Iofin (psychiatrist). (R. 325-28.) Plaintiff informed Dr. Iofin that her current medications included Albuteral, Amitriptyline,

Flovent, Losartan, Neurontin, Metoprolol, Tramadol, Trazadone, Tylenol, and Zoloft. Plaintiff stated that she began to experience depressive and anxiety symptoms at about age 12, and the symptoms worsened after developing significant medical problems later in life. She experienced problems with sleep, irritability, crying spells, and problems with attention and concentration. She also experienced panic attacks that were initially infrequent but had increased to several times a month. Plaintiff stated that she had never been treated by a psychiatrist. However, she had been prescribed psychotropic medications by her primary care physician, and she had found them to be helpful in alleviating her psychiatric symptoms. Plaintiff also acknowledged a medical history significant for obesity, elevated cholesterol, high blood pressure, and fibromyalgia. As to her activities of daily living, Dr. Iofin reported:

> [Plaintiff] referred to her regular day to day activities as mostly sedentary, spending time at home taking care of her 8 year old child including sending him to school and picking him up from school and taking care of the needs of the household. She spends time watching TV, listening to music and spending time interacting with friends and acquaintances. She referred to her ability to dress and undress herself, take showers and maintain personal and dental hygiene by herself. She referred to instrumental activities of daily living in the household including but not limited to cooking, vacuuming, laundry, dishwashing etc as being done primarily by herself. Her adult daughter also visits a few times per week to visit and help her but she estimated that she herself performs about 90 percent of the chores and the remaining 10 percent is done by the adult daughter.

(R. 326.) Dr. Iofin also reported:

> On mental status examination, the patient appeared to be stated age female who maintained reasonable eye contact, did not present as grossly delusional or paranoid, was oriented X 3, did not present as agitated, unmanageable or disruptive at the time of assessment. She did not appear to be psychotic, did not appear to act under the influence of internal stimuli. She did not endorse presence of auditory, visual, tactile or olfactory hallucinations. Her mood was found to be anxious but not aggregately dysphoric during the assessment with mood congruent not aggregately labile. Her thought process was logical; no thought blocking, no thought derailment, pressured speech, rambling or loose associations were noted throughout the duration of the examination. Her speech was goal oriented, with ability to follow the interview with limited tangentiality and circumstantiality being noted and without significant vacillation in tone or volume of her voice. On cursory

cognitive examination, she was able to repeat 3 out of 3 words immediately, two out of 3 words five minutes later.  She was able to repeat 6 digits forward, 4 digits backward.  She was able to spell "table" backwards without difficulty.  She was able to do good quality serial seven, subtracting 7 from 100 in reverse order.  She was able to put presidents in order starting with Obama ending with Bush and gave reasonable explanations to proverbs such as "don't cry over spilled milk" and "too many cooks will spoil the broth."  Impulse control was found to be satisfactory throughout the assessment.

(R. 327.)  Dr. Iofin diagnosed depressive disorder NOS, anxiety disorder NOS, panic disorder with agoraphobic tendencies, and mood disorder secondary to medical problems with depressive and anxiety features.  He assessed a GAF of 60 and recommended that Plaintiff consider follow-up with mental health professionals located within geographic proximity.

### 3. Non-Examining Physicians.

In August 2013, State Agency reviewing consultants opined that:

- Plaintiff had no severe vision impairments.

- Plaintiff could lift/carry up to 10 pounds frequently; lift/carry up to 20 pounds occasionally; stand and/or walk up to 6 hours in an 8-hour workday; and sit up to 6 hours in an 8-hour workday.

- Plaintiff had no other exertional, postural, manipulative, visual, communicative, or environmental limitations.

- Plaintiff did not meet the criteria for Listings 12.04 (Affective Disorders) or 12.06 (Anxiety-Related Disorders).  As to the Paragraph B criteria, Plaintiff had no repeated episodes of decompensation and mild limitations as to each daily living activities; social functioning; and concentration, persistence, or pace.

(R. 85-95, 97-107.)  In December 2013, State Agency reviewing consultants reaffirmed these opinions on reconsideration.  (R. 109-20, 122-33.)

### B. **Reports/Hearing Testimony.**

Plaintiff's May 2013 Disability Report listed the following impairments:  fibromyalgia, high blood pressure, allergy, asthma, and depression. (R. 211-18.)  She added diabetes to the impairment list in her October 2013 Disability Report (R. 233-38) and irritable bowel syndrome

to the list in her February 2014 Disability Report (R. 256-61).  Plaintiff submitted Function Reports

in July and November 2013 (R. 219-26, 240-47), and her daughter submitted a Third-Party

Function Report in November 2013 (R. 248-55); the ALJ summarized these Reports as follows:

> I have reviewed and considered function reports completed by the claimant at
> Exhibits B2E and B6E and by her adult daughter at Exhibit 7E.  These reports state
> that the claimant does perform her own personal care with difficulty using her hands
> to button clothes.  She does walk, take cabs and use public transportation
> independently.  She does do laundry and cleaning which takes longer to complete.
> She shops in stores and she does cook.  She takes her daughter to school.  She does
> pay bills and she handles money.  The claimant's complaints of bilateral hand
> numbness has been considered as well as her statements that she does not handle
> stress well, that instructions need to be repeated and that she does not finish what
> she starts.

(R. 26.)  The Court notes that Plaintiff indicated in her July 2013 Function Report that she used a

cane prescribed by her doctor.  In her November 2013 Function Report, Plaintiff stated that she

"can't use cane because of numbness and pain in both hands."

Plaintiff testified during the September 2015 hearing and was questioned by both her

former counsel and the ALJ.  (R. 36-67.)  The ALJ's decision included that:

- "[T]he claimant testified that she has shooting pain in her lower back and that she
  gets numbness in her feet.  Pain goes down to her thighs.  She testified that she has
  carpal tunnel syndrome.  She has painful wrists.  She stated that she has a shooting
  pain from her joints into her toes.  She has spasms.  She wears a brace on her right
  knee."

- Plaintiff testified that she has "multiple joint and spinal pain, stiffness, etc., related
  to fibromyalgia."

- Plaintiff testified that she uses a cane.

- Plaintiff testified "to visual disturbances related to frequent eye spasms, twitching
  and burning.  She testified that she was advised to use eye drops.  She stated that
  she gets eye pain, which is brought on by bright light.  She does not use a computer
  or watch television.

Plaintiff's brief summarizes the hearing transcript in chronological page order.  *See* ECF No. 11

at 4-7.  The Court notes the following relevant testimony from Plaintiff's summary:

- Plaintiff testified that she tries to clean her apartment and has help from her daughter.  Plaintiff does not cook every day except for easy things like goulash that she can leave on the stove; she cannot cut vegetables.  She shops at local stores with help from her daughter carrying bags.  Plaintiff cannot lift a gallon milk.  She also uses a washing machine in her apartment by herself but needs help from her daughter hanging up the laundry to dry.  Plaintiff finds it difficult to take the bus because of the internal steps, because she cannot stand if the seats are occupied, and because she is claustrophobic.

- Plaintiff testified that she can sit for 10-15 minutes before needing to move because of lower back and sciatic pain that extends down to her feet on the right side.  Her feet fall asleep if she sits too long; she elevates her legs at home.  Plaintiff can walk 2 blocks using knee braces and a cane.  She can stand for 10-15 minutes if leaning on something but otherwise can stand only for 5 minutes.

- Plaintiff testified that she used to experience panic attacks every day before she was prescribed Zoloft.  Her panic attacks now happen once or twice a month.  It helps her to stay at home away from people.  She also has difficulty with memory and concentration.

- Plaintiff testified that her current medications are Neurontin, Tramadol, and Zoloft.

- Plaintiff testified that she has worn her prescribed wrist braces for around a year but cannot wear them all the time "because her hands fall asleep and she can hardly hold something."

## V.    DISCUSSION

### A.    Obesity.

Plaintiff correctly asserts that since obesity is no longer a listed impairment, the ALJ must "consider [obesity's] effects when evaluating disability" and recognize at each step of the sequential inquiry that "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately."  Social Security Ruling 02-1p, *Titles II & XVI: Evaluation of Obesity*, 2002 WL 34686281, at *1 (S.S.A. Sep. 12, 2002) ("obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing").  Plaintiff contends that the ALJ's failure to

consider obesity at Steps Two through Four of the sequential inquiry was reversible error.[9]  The Court disagrees.

Even if the ALJ had erroneously concluded at Step Two that Plaintiff's obesity was non-severe, the Court finds that such error is harmless because the ALJ nevertheless found in Plaintiff's favor at Step Two.  *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007); *see Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 261 n.2 (3d Cir. 2006) (same).  As to Steps Three and Four, the Court rejects Plaintiff's argument for the same reasons that the Third Circuit rejected the identical argument in *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005):

> *Skarbek v. Barnhart*, 390 F.3d 500 (7th Cir. 2004) (per curiam) has recently considered the precise argument that Rutherford now asserts.  In rejecting the notion "that the ALJ's failure to mention his obesity is reason enough to remand the case" (*id*. at 504), the Seventh Circuit articulated an analysis that might well have been written for this case (*id*.) (citations omitted):
>
> > An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence.  Although [claimant] did not specifically claim obesity as an impairment (either in [her] disability application or at [her] hearing), the references to [her] weight in [her] medical records were likely sufficient to alert the ALJ to the impairment.  Despite this, any remand for explicit consideration of [Plaintiff's] obesity would not affect the outcome of this case.  Notably, [Plaintiff] does not specify how [her] obesity further impaired [her] ability to work, but speculates merely that [her] weight makes it more difficult to stand and walk.  Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [Plaintiff's] obesity.  Thus, although the ALJ did not explicitly consider [Plaintiff's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.
>
> We follow the Seventh Circuit and conclude that a remand is not required here because it would not affect the outcome of the case.  Rutherford never mentioned obesity as a condition that contributed to her inability to work, even when asked

---

[9] Plaintiff argues in her initial brief that the ALJ's decision "makes no mention of" her obesity. ECF No. 11 at 16.  However, Plaintiff acknowledges in her reply that the ALJ stated at Step Four:  "I have also considered obesity i.e. 62" tall and 215 pounds in finding that standing/walking is limited to up to 4 hours of standing/walking in an 8 hour day." ECF No. 16 at 5 (citing R. 26 (record citation omitted)).

> directly by the ALJ to describe her impairments.  So even if we assume—in accordance with common sense—that the administrative record's evidence of Rutherford's 5'2" height and her weight of some 245 pounds sufficed to alert the ALJ that obesity could be a factor, Rutherford has not specified how that factor would affect the five-step analysis undertaken by the ALJ, beyond an assertion that her weight makes it more difficult for her to stand, walk and manipulate her hands and fingers.  That generalized response is not enough to require a remand, particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding her limitations and impairments.  Because her doctors must also be viewed as aware of Rutherford's obvious obesity, we find that the ALJ's adoption of their conclusions constitutes a satisfactory if indirect consideration of that condition.

*Rutherford*, 399 F.3d at 552-53 (citations omitted).  Here, as in *Rutherford*:  (1) Plaintiff did not claim any obesity as an impairment in her DIB or SSI applications; (2) Plaintiff did not claim obesity as an impairment in her hearing testimony; (3) references to Plaintiff's weight in her medical records were sufficient to alert the ALJ to the impairment; (4) no medical provider "mentions obesity as contributing to any limitation" (*Rutherford*, 399 F.3d at 553); and (5) Plaintiff offers no specificity as to how her obesity allegedly impaired her ability to work.  The Court also finds that any error by the ALJ regarding Plaintiff's weight at Steps Three and Four is harmless.[10]

## B.    Step Three.

At Step Three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments[.]"  (R. 23.)  The ALJ expressly considered Listings 1.02 (Major dysfunction of a joint(s) (due to any cause)), 1.04 (Disorders of the spine), 2.00 (Special senses and speech), 12.04 (Affective

---

[10] Although the Court cannot and does not rely in any way on the Appeals Council's decision, the Court notes that the Appeals Council also concluded that consideration of Plaintiff's obesity would not provide a basis for changing the ALJ's decision.  (R. 2.)  The Court nevertheless urges that the record on remand include explicit consideration of Social Security Ruling 02-1p.

disorders), and 12.06 (Anxiety-related disorders).[11]   As to the first three Listings, the ALJ wrote: "Sections 1.02, 1.04, 2.00ff [sic] were reviewed."  (R. 23.)  As to Listings 12.04 and 12.06, the ALJ found that Plaintiff failed the Paragraph B criteria (which are identical for both Listings) because she had no restriction in daily living activities; mild difficulties in social functioning; moderate difficulties with concentration, persistence, or pace; and no decompensation episodes. The ALJ also found without elaboration that "the evidence fails to establish the presence of the '[P]aragraph C' criteria" (which differs between the Listings).  (R. 23-24.)  Plaintiff contends that the ALJ reversibly erred by failing within this section of the decision to explain his analysis of Listings 1.02 and 1.04 and to analyze Plaintiff's fibromyalgia.[12]   The Court disagrees.

As a threshold matter, the ALJ need not "use particular language or adhere to a particular format in conducting analysis" so long as "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [claimant] did not meet the requirements for any [L]isting."  *Jones*, 364 F.3d at 505 ("the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review").  Thus, the Court must determine whether the ALJ's evidentiary discussion – regardless of its placement in the decision – supports a finding of not disabled at Step Three pursuant to the applicable legal standards of review.  *See Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146-47 (3d Cir. 2007).

---

[11] The Court analyzes all Listing criteria, as did the ALJ, in effect on October 6, 2015, the date of the ALJ's decision.  The applicable criteria are described in Social Security Administration Program Operations Manual System ("POMS") DI 34121.011, *Musculoskeletal Listings from 06/16/2008 to 09/28/2016*, available at http://policy.ssa.gov/poms.nsf/lnx/0434121011; POMS DI 34122.011, *Special Senses and Speech Listings from 04/29/13 to 03/26/17*, available at http://policy.ssa.gov/poms.nsf/lnx/04344122011; and POMS DI 34132.009, *Mental Listings from 12/18/07 to 09/28/16*, available at http://policy.ssa.gov/poms/nsf/lnx/0434132009.

[12] Plaintiff's brief does not dispute the ALJ's Step Three findings as to Listings 2.00, 12.04, and 12.06.

### 1.    Listings 1.02 & 1.04.

Listing 1.02 provides:

Major dysfunction of a joint(s) (due to any cause):  Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:

A.    Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

OR

B.    Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00 B2c.

POMS DI 34121.011.  Under Listing 1.00 B2b, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of *both* upper extremities." *Id*. (emphasis added).  Under Listing 1.00 B2c, "[i]nability to perform fine and gross movements effectively means an extreme loss of function of *both* upper extremities" – i.e., seriously interference with daily living activities.  *Id*. (emphasis added).  The ALJ's evidentiary discussion did not reference:  evidence of gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) or findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  Indeed, there is no imaging evidence in the record aside from Plaintiff's bone density scan that revealed no evidence of osteoporosis.  Nor did the ALJ's decision reference evidence either that Plaintiff can walk only with the use of a handheld assistive device that limits functioning of both upper extremities, or that she has an extreme loss of function in both upper extremities.  (R. 24-27.)

Listing 1.04 provides:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:

A.    Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

OR

B.    Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

OR

C.    Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in an inability to ambulate effectively, as defined in 1.00 B2b.

POMS DI 34121.011.  Although Dr. Fogari intermittently included "degenerative disc disease" among other diagnoses in his treatment notes, neither his treatment notes nor the other evidence cited in the ALJ's decision referenced nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication – let alone the other requisite criteria for Listings 1.04A, 1.04B, and 1.04C.  The same is true for Dr. Ortiz's one-time diagnosis of degenerative disc disease, which was based on Plaintiff's stated history.  Notably, Plaintiff did not mention that Dr. Ortiz had prescribed a lumbar brace or that she ever used the device.

Plaintiff does not cite – nor can the Court identify – any evidence overlooked by the ALJ demonstrating that any of her impairments (including obesity), taken singly or in combination, meet or medically equal the severity of Listings 1.02 or 1.04.  The Court therefore finds that any

error in the ALJ's Step Three finding in this regard was harmless.  *See Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 162 (3d Cir. 2008) (affirming Step Three determination where claimant "provides us with no citations to any record evidence demonstrating that her impairments are of Listing-level severity"); *Domkos v. Colvin*, No. 15-cv-2660 (JLL), 2016 WL 1732380, at *3 (D.N.J. May 2, 2016) (noting that "[i]t is not enough to simply call foul and punt to this Court for research and analysis" when appealing Step Three finding).

### 2.    Fibromyalgia.

The Court rejects Plaintiff's four arguments for remanding the ALJ's Step Three finding as to her fibromyalgia.

First, Plaintiff argues that the ALJ failed "to comply with the Commissioner's policies in evaluating the severity of [P]laintiff's fibromyalgia."  Plaintiff invokes Social Security Ruling 12-2p and purportedly recites the Deputy Commissioner of Social Security's "eloquent[] reaffirm[ance]" of "the Commissioner's policy that fibromyalgia can constitute a medically determinable impairment 'given the presence of certain specified signs and findings'."  ECF No. 11 at 11-12 (quoting uncited source).  As Judge Salas explained in rejecting the same argument offered by Plaintiff's counsel in another case:

> The purpose of SSR 12-2p is to "provide[ ] guidance on how ... [to] develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how ... [to] evaluate fibromyalgia in disability claims and continuing disability reviews."  *Evaluation of Fibromyalgia*, SSR 12-2p 2012 WL 3104869 (S.S.A. July 25, 2012).   Here, the ALJ concluded that Plaintiff's fibromyalgia was a severe impairment – a decision in Plaintiff's favor.  Simply put, there was no need for "guidance on how ... [to] develop evidence to establish that a person has a medically determinable impairment of fibromyalgia" because the ALJ did in fact conclude that Plaintiff's fibromyalgia was a severe impairment.

*Rivera v. Comm'r of Soc. Sec.*, No. 15-CV-1088 (ES), 2016 WL 4718143, at *4 (D.N.J. Sep. 9, 2016).   The ALJ in this case was likewise able to determine at Step Two that Plaintiff's

fibromyalgia was a severe medically determinable impairment without need for additional guidance. (R. 22.)

Second, Plaintiff argues that:

> The Administrative Law Judge reversibly erred by failing to consider whether the [P]laintiff's fibromyalgia equals a listing. SSR 12-2p observes that while fibromyalgia cannot meet a [L]isting since there is no [L]isting for the condition, adjudicators *must consider whether it medically equals a listing*. *Id.* The Ruling points to Listing 14.09D, which pertains to inflammatory arthritis, as an example of a [L]isting that might be equaled by a claimant suffering from fibromyalgia. *Id.* Further, the Ruling alludes to the possibility that fibromyalgia might equal a [L]isting when considered in combination with one or more other impairments.

ECF No. 11 at 11 (citing Social Security Ruling 12-2p, *Titles II & XVI: Evaluation of Fibromyalgia*, 2012 WL 3104869, at *6 (S.S.A. Jul. 25, 2012)). Plaintiff's argument fares no better in this case than when raised by Plaintiff's counsel in *Bush v. Commissioner of Social Security*. As Judge Chesler explained in that case:

> Plaintiff's argument suffers from two principal defects: 1) its failure to deal with the issue of the burden of proof at the first four steps of the sequential evaluation process; and 2) its failure to deal with the harmless error doctrine. As to the burden of proof, Plaintiff bears the burden in the first four steps of the analysis of demonstrating how [her] impairments, whether individually or in combination, amount to a qualifying disability.

> As to the harmless error doctrine, the Supreme Court explained its operation in a similar procedural context in *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009), which concerned review of a governmental agency determination. The Court stated: "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Id.* In such a case, "the claimant has the 'burden' of showing that an error was harmful." *Id.* at 410.

> Plaintiff thus bears the burden, on appeal, of showing not merely that the Commissioner erred, but also that the error was harmful. At the first four steps, this requires that Plaintiff also show that, but for the error, [she] might have proven [her] disability. In other words, when appealing a decision at the first four steps, if Plaintiff cannot articulate the basis for a decision in [her] favor, based on the existing record, [she] is quite unlikely to show that an error was harmful.

> Under *Shinseki*, even if Plaintiff succeeded in persuading that the ALJ erred at [S]tep [T]hree, Plaintiff also bears the burden of showing that this error was

harmful, and Plaintiff has not done so.  To show that such an error was harmful, Plaintiff would need to, at a minimum, point to evidence of record that might have sustained [her] burden of proof of disability.  At a minimum, again, she would need to explain which impairments, combined, should have been found to be medically equivalent to what Listing.

The Third Circuit has held:  "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover."  *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).  Conspicuously absent from Plaintiff's brief is any statement of what Listing Plaintiff contends [she] meets or equals.  Plaintiff fails to explain how the [S]tep [T]hree analysis might have been performed differently so as to make a material difference in the disability determination.  The Court is not persuaded that the [S]tep [T]here analysis was inadequate but, even if it was defective, given that Plaintiff has made no case on appeal that [she] met [her] burden of proof at [S]tep [T]here, such defects could not be more than harmless error.  Plaintiff has not even pointed to the Listing that [she] claims to have met or equaled, much less pointed to evidence of record that might have supported such a determination.  As such, Plaintiff has failed to persuade that any possible errors at step three materially harmed [her].  As in *Rutherford v. Barnhart,* 399 F.3d 546, 553 (3d Cir. 2005), "a remand is not required here because it would not affect the outcome of the case."

*Id.*, No. 14-cv-2086 (SRC), 2015 WL 3889543, at *2 (D.N.J. Jun. 25, 2015); *see Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (affirming Step Three finding where claimant complained "in vague terms that certain impairments were not properly compared, separately and in combination, to the listings" without identifying "specific avenues for meeting or equaling specific listings that the ALJ should have considered but did not"); *Milano v. Comm'r of Soc. Sec.*, 152 F. App'x 166, 169 (3d Cir. 2005) (affirming ALJ's finding where claimant "has not attempted to show that her impairments meet or equal any specific Listing, and merely concludes that she has 'severe medical conditions' that 'might' do so") (internal citation omitted)).

Third, Plaintiff argues that the ALJ reversibly erred by failing to obtain an updated opinion from a medical expert pursuant to Social Security Ruling 96-6p.  ECF No. 11 at 12 (citing SSR 96-6p, *Consideration Of Administrative Findings Of Fact By State Agency Medical And Psychological Consultants And Other Program Physicians And Psychologists At The*

*Administrative Law Judge And Appeals Council Levels Of Administrative Review; Medical Equivalence*, 1996 WL 374180 (S.S.A. Jul 2, 1996).[13]  Social Security Ruling 96-6p instructs that an ALJ must consult a medical expert if, and only if, the ALJ believes that "the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or [w]hen additional medical evidence is received that in the opinion of the [ALJ] may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments."  *Id*. at *3-4; *see Hardee v. Comm'r of Soc. Sec.*, 188 F. App'x 127, 129 (3d Cir. 2006) (ALJ has "broad discretion in determining whether to consult with a medical expert).  The Court rejects this argument for the same reasons as Plaintiff's previous argument – namely, that any error in failing to consult a medical expert was harmless because Plaintiff fails to identify any record evidence suggesting that her fibromyalgia is medically equivalent to any Listing.

Fourth, Plaintiff argues that the ALJ reversibly erred by failing to obtain "an updated medical record from [P]laintiff's treating physician which contained the information needed to make a[n] accurate determination of [her fibromyalgia]."  ECF No. 11 at 13.  This argument rests on Plaintiff's assertions that the ALJ reviewed stale medical records and/or lacked the longitudinal information necessary to consider the waxing and waning nature of fibromyalgia symptoms. These assertions are incorrect.  The record before the ALJ included treatment notes from Plaintiff's primary care physicians for the 5-year period from January 2010 to February 2015 and treatment notes from Plaintiff's rheumatologist for the 19-month period from February 2014 to September

---

[13] Social Security Ruling 96-6p applies to the Court's review of SSA decisions issued prior to March 27, 2017.  *See* Social Security Ruling 17-2pp, *Titles II & XVI:  Evidence Needed By Adjudicators At The Hearings And Appeals Council Levels Of The Administrative Review Process To Make Findings About Medical Equivalence*, 2017 WL 3928306, at n.27 (S.S.A. March 27, 2017).

2015. The ALJ's decision was issued in October 2015 – *only one month* after Plaintiff's then most-recent rheumatology appointment and with the benefit of *nearly 6 years* of medical evidence.

The Court therefore finds that any error in the ALJ's Step Three finding as to her fibromyalgia was harmless. Nevertheless, the Court urges that the Social Security Rulings discussed above be followed on remand.

### C.    **Plaintiff's Subjective Symptoms.**

"Credibility determinations as to a claimant's testimony, regarding pain and other subjective complaints are for the ALJ to make." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). The ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process. *See* 20 C.F.R. § 416.929. First, the ALJ must determine whether the record demonstrates that the claimant possesses a medically determinable impairment that could reasonably produce the alleged symptoms. *See Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 119-20 (3d Cir. 2016) ("while there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself") (citations omitted). Second, the ALJ must assess the credibility of the claimant's complaints regarding the intensity of the symptoms. To do this, the ALJ must determine if objective medical evidence supports the claimant's complaints. If so, the complaints should be given great weight and "may not be disregarded unless there exists contrary medical evidence." *Id*. If objective medical evidence does not support the claimant's complaints, then the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the pain; (5) treatment, other than medication, the claimant receives or has

received for relief of pain or other symptoms, (6) any other measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Social Security Ruling 96-7p, *Policy Interpretation Ruling Titles II & XVI:  Evaluation of Symptoms in Disability Claims:  Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).[14]

The ALJ stated that, "[a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (R. 25.)  Plaintiff contends that the ALJ's credibility assessment was not supported by substantial evidence.  The Court observes that, as discussed below, the ALJ included multiple limitations in the RFC finding based not on medical evidence but on Plaintiff's statements regarding her subjective symptoms.  The Court cannot meaningfully review this assessment because it is unclear how much of it rested, as discussed below, on the ALJ's failure to consider that Plaintiff was prescribed and wears bilateral wrist splints and knee braces.

---

[14] Social Security Ruling 96-7p applies to the Court's review of SSA decisions issued prior to March 28, 2016.  *See* Social Security Ruling 16-3p, *Titles II & XVI:  Evaluation of Symptoms In Disability Claims*, 2017 WL 5180304, at n.27 (S.S.A. Oct. 25, 2017).

### D.    **Step Four – RFC Finding.**

At Step Four, the ALJ found:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk up to 4 hours in an 8 hour workday; sit up to 6 hours in an 8 hour workday; frequent fine fingering and gross handling; no work around dangerous machinery or unprotected heights; she can perform unskilled work tasks; constant near visual acuity; and she would be off task up to 10% of the workday.

(R. 24.)  Plaintiff contends that the RFC finding "is simply conclusory and does not contain any rationale or reference to the supporting evidence."  ECF No. 11 at 23.  The Court agrees that remand is warranted as to the exertional limitations (lift/carry, stand/walk/sit) and the manipulative limitations (fingering/handling).

The ALJ stated that "[t]here is no evidence of significant hand/wrist limitations" based on Dr. Patel's July 2013 consultative examination – one year *before* Plaintiff's EMG/NCV study – in which Dr. Patel concluded that she had full fine/gross movements in her hands with normal grip strength.  (R. 25.)  The ALJ also stated that, although he ascribed "some weight" to the State Agency reviewing consultants' July 2013 opinions that Plaintiff could perform light work without any postural or manipulative limitations, he also "considered [Plaintiff's] complaints of numbness/pain in her hands and EMG/NCV study findings of mild left sensory median nerve neuropathy at the wrist in finding that she can perform frequent fine fingering and gross handling." (R. 26.)  The ALJ's decision did not mention:  Plaintiff's November 2013 Function Report statement that she "can't use cane because of numbness and pain in both hands;" Plaintiff's September 2014 statement to Dr. Ortiz that Dr. Fogari did not give her wrist braces and Dr. Ortiz's subsequent prescription of bilateral wrist splints in September 2014; or Plaintiff's hearing testimony that she cannot wear the splints all the time "because her hands fall asleep and she can

hardly hold something." Nor did the ALJ reconcile his finding that Plaintiff can perform frequent fingering/handling with his adoption of Plaintiff's Function Report statement that she has difficulty using her hands to button clothes. The Court finds that remand is warranted so the ALJ can more fully develop the record as necessary in this regard, resolve conflicting evidence, and explain if or how it impacts Plaintiff's RCF.

After citing Plaintiff's testimony "that she wears a right knee brace," the ALJ found that there is no evidence that Plaintiff was prescribed such a device or that one is required for ambulation. (R. 25.) However, Dr. Ortiz prescribed bilateral knee braces in February 2015 based on an examination finding of crepitus and a diagnosis of osteoarthritis. Plaintiff also testified that she often wore both braces at the same time. The Court finds that remand is warranted so the ALJ can more fully develop the record as necessary in this regard and explain if or how it impacts Plaintiff's RCF.

The Court rejects Plaintiff's argument that the RFC finding fails to incorporate additional limitations. As to Plaintiff's generalized pain complaints, the ALJ correctly found that nearly all treatment notes reflect normal examination findings, and there is no diagnostic evidence supporting a diagnosis of degenerative disc disease. Nevertheless, the ALJ limited Plaintiff to standing/walking less than 4 hours in an 8-hour day. As to her visual impairments, the ALJ accurately noted that the medical evidence revealed no evidence of eye abnormalities other than astigmatism and presbyopia with corrected vision of 20/20; and that evidence of an ocular allergy that improved with treatment.[15] Nevertheless, the ALJ limited Plaintiff to constant near visual acuity. As to Plaintiff's mental impairments, the ALJ accurately noted that Plaintiff is not (and

---

[15] The Court notes that although Plaintiff is being monitored for glaucoma suspect, there is no medical evidence of any resulting functional limitation.

had never been) under any mental health care; and that Dr. Iofin did not opine in his July 2013 consultative examination report as to any functional limitations. Nevertheless, the ALJ limited Plaintiff to unskilled work. The Court identifies no error in these aspects of the RFC finding.

The Court therefore finds that remand is warranted because substantial evidence does not support the exertional and manipulative limitations in the RFC finding.

### E.    Step Five.

The Court cannot meaningfully review the ALJ's Step Five findings because the decisional RFC finding was flawed. The Court offers the following observations regarding Plaintiff's contention that the ALJ committed reversible error at Step Five.

The VE testified that a hypothetical individual with the decisional RFC could perform the requirements of at least 3 jobs: addresser (DOT# 209.587-10; 25,201 jobs in national economy); document preparer (DOT# 249.587-018; 98,80 jobs in national economy); and order clerk (DOT# 209.567-014; 19,105 jobs in national economy). Pursuant to Social Security Ruling 00-4p, the ALJ found "that the [VE's] testimony is consistent with information contained in the *Dictionary of Occupational Titles* [DOT]." (R. 28 (citing Social Security Ruling 00-4p, *Titles II & XVI: Use of Vocational Expert And Vocational Specialist Evidence, And Other Reliable Occupational Information In Disability Decisions*, 2000 WL 1898704 (S.S.A. Dec. 4, 2000)).[16] The ALJ accordingly found:

---

[16] *See* U.S. Dep't of Labor, *Dictionary of Occupational Titles* (G.P.O. rev. 4th ed. 1991), available at https://www.oalj.dol.gov/LIBDOT.HTM. Social Security Ruling 00-4p provides in relevant part:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully

> Based on the testimony of the vocational expert, I conclude that considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of [Grid Rule 202.21].

(R. 28.) Plaintiff argues that the ALJ's Step Five finding is not supported by substantial evidence because light work requires the ability to stand for 6 hours in an 8-hour workday – and the decisional RFC limits Plaintiff to 4 hours standing/walking (and 6 hours sitting) in an 8-hour workday. ECF No. 11 at 20-21 (citing Social Security Ruling 83-10, *Titles II & XVI:  Determining Capability To Do Other Work – The Medical-Vocational Rules Of Appendix 2*, 1983 WL 31251, at *5 (S.S.A. 1983)).  This argument fails for two independent reasons.

First, at least one other court in this District has found "meritless" the broad argument that "any job title that the DOT classifies as light work requires that a person be able to stand and/or walk for six hours." *Trzeciak v. Colvin*, No. 15-cv-6333, 2016 WL 4769731, at *10 (D.N.J. Sep. 12, 2016) (McNulty, J.).  As Judge McNulty explained:

> The regulations [20 CFR §§ 404.1567(b) and 416.967(b)] clearly include some jobs that "involve[] sitting most of the time" within the category of light work.  The same is true for the DOT's definition, which notes that
>
> > Even though the weight lifted may be only a negligible amount, a job should be rated Light Work:  (1) when it requires walking or standing to a significant degree; or (2) *when it requires sitting most of the time* but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.
>
> Appendix C:  Components of the Definition Trailer, *Dictionary of Occupational Titles*, U.S. Dep't of Labor, Office of Administrative Law Judges (4th ed. 1991), *at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM (emphasis added).  Alternatives two and three clearly allow some jobs to be

---

develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

2000 WL 1898704, at *2.

classified as "light work" without a requirement of walking or standing to a significant degree.

*Id.* at *10-11; *accord Hence v. Astrue*, No. 12-cv-1, 2012 WL 6691573, at *7 (E.D. Va. Nov. 30, 2012) (Miller, M.J.) ("Moreover, the definition of light work acknowledges that some light work can be performed while 'sitting most of the time.'") (quoting 20 C.F.R. § 416.967(b)), *report and recommendation adopted*, 2012 WL 6697109 (E.D. Va. Dec. 21, 2012) (Davis, J.).

Second, as the VE testified and the ALJ's decision noted, the 3 jobs identified by the VE are classified by the DOT are unskilled *sedentary* (not light) jobs. Social Security Ruling 83-10 provides that "[s]ince being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." *Id.*, 1983 WL 31251, at *5. The decisional RFC is facially consistent with this provision.[17]

## V.    CONCLUSION

For these reasons, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case to the Commissioner for further proceedings in accordance with the preceding instructions and the accompanying Order.

Dated:   March 8, 2019                          _____s/ Paul A. Zoss_____
At Newark, New Jersey                       PAUL A. ZOSS, U.S.M.J.

---

[17] The Court need not address Plaintiff's additional argument that the ALJ erred at Step Five because the hypothetical questions to the VE did not include all credibly established limitations. This argument restates Plaintiff's criticism of the RFC finding at Step Four, which the Court has already determined requires remand. *See Rutherford*, 399 F.3d at 554 n.8.